IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| JAIMIE HILEMAN, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. 17-cv-165-SMY-MAB |
| | ) |
| INTERNET WINES & SPIRITS CO., | ) |
| d/b/a/ RANDALL'S WINE & SPIRITS, | ) |
| and GEORGE RANDALL, | ) |
| | ) |
| Defendants. | ) |

# MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Jaimie Hileman, a former employee of Defendant Internet Wine Stores, brings this action alleging retaliation in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq* and the Missouri Human Rights Act, § 213.070 RSMo. Now pending before the Court are Defendants' Motion for Summary Judgment (Doc. 70) and Plaintiff's Partial Motion for Summary Judgment (Doc. 71). Responses have been filed (Docs. 80, 82). For the following reasons, both Motions are **DENIED**.

## Background

Internet Wine Stores d/b/a Randall's Wine & Spirits Co. ("IWS") is owned by George Randall (Doc. 70-3, p. 9). IWS hired Plaintiff Jaimie Hileman in 2011 as the Operations Manager for three of its retail stores (Doc. 70-2, p. 17). In April 2013, Hileman informed Randall that she was transgender and would be transitioning from male to female. *Id*. at p. 31. She was demoted to store manager of Randall's North County store in August 2013. *Id*. at pp. 21-22.

Hileman sued IWS and Randall in 2014 for discrimination and retaliation (*see Hileman v. Internet Wine & Spirits Co. d/b/a Randall's Wine & Spirits et al*, Case No. 13-cv-165). The parties settled the case in March 2015 (Doc. 82-4). As part of the negotiated Settlement Agreement, Hileman resigned her employment with IWS and entered into a confidential Release and Settlement Agreement. *Id*.

On November 12, 2015, Hileman participated in a Fox2 News television report entitled "Transgender Community Facing Discrimination in Workplace" (Doc. 70-1). Reporter Mandy Murphey interviewed Hileman about her experience as a transgender person in the workplace:

> REPORTER: 90 percent of transgender adults face some sort of discrimination at work, and in Missouri an employer can fire a person simply for being transgender. Tonight in the FOX Files, efforts to change the laws. Jaimie Hileman spent her career as a successful executive in the wine and spirits industry, but she was hiding who she really was. She lived and worked as a man, her birth gender, but finally decided to come out and transition to a woman. She remembers how she told her boss and clients.
>
> HILEMAN: "I just wanted you to know that I am and have known for a very long time that I was transgender, and I've reached that point in my life where I am transitioning. I've known myself to be female. I will be dressing and appearing as female starting at work tomorrow. Thought you should know."
>
> REPORTER: Jaimie was fired not long after.
>
> HILEMAN: They did not react well. And within two months, it distinctly affected my job status, and resulted in discrimination litigation.
>
> REPORTER: All Jaimie can say is that the lawsuit was resolved to the satisfaction of all parties. But the reality is transgender employees like Jaimie can be fired from their jobs in Missouri simply because of their sexual orientation. The Missouri human rights statute does not protect them from discrimination…

(Doc. 70-1, pp. 2-3). During the report, neither Hileman nor Murphey mentioned IWS by name. *Id.*

An employee told Todd Randall about the news report and Todd notified his father George (Doc. 70-4, p. 17). Todd felt that the report was defamatory and contained false statements that

violated the Settlement Agreement (Doc. 70-4, p. 20).  Specifically, Todd believed Hileman's statement that she was fired because of her transition was untrue.  *Id*.  George was surprised by the "lying" in the report pertaining to Hileman being fired (Doc. 70-3, p. 33).  He also believed that IWS was identified in the report because there were no other transgender executives in the wine and spirit industry in St. Louis.  *Id.* at pp. 33-35.  George talked to his family and lawyers following the news report.  His attorneys believed that Hileman had breached the Settlement Agreement.  *Id.* p. 47.  George agreed that IWS should file a lawsuit against Hileman:

> [I]t was something where we agreed in a contract to keep our mouth shut and be civil to each other in this complaint, okay?  I felt strongly that it was a bad decision for Ms. Hileman to talk to a reporter about our agreement, which she vowed and I paid her a dearly sum of money not to talk about, and she violated that.  And the fact that "fired" was mentioned six or more times, okay, was not true, and was a lie.  And so I assumed that because she told her about the lawsuit and that she couldn't talk about it, that was not something for her to say, that she told her other things.  I don't know in a 15-minute or 30-minute conference what she did say or didn't say, okay?  And it's wrong.  And so I went to my attorneys and said, Okay, this is my take on it, that I am violated, okay?  That my company is exposed.  That my company – my company was losing customers.  My company in North County was losing profit, sales, okay?  I was the one who was being hurt, okay?  And felt that, you know what?  I've got to make sure, as she came after me for discrimination, I've got to come after her and say, Look, ma'am, please, we had an agreement not to talk about these things, and you lied about firing.  And it showed that I had loss of customers, loss of people knowing.

(Doc. 70-3, pp. 97-98).

Three months after the news report aired, IWS filed a lawsuit against Hileman in state court asserting claims of defamation and breach of the Settlement Agreement (Doc. 82-8).  Specifically, IWS alleged that Hileman had breached the Non-Disparagement Clause of the Settlement Agreement during the news report by stating that IWS had fired her because of transgender discrimination.  *Id*.  IWS sought the return of the money it paid to settle the discrimination claim as liquidated damages, punitive damages, and other relief.  *Id*.

During the discovery phase in the state court action, Hileman sought the disclosure of all facts on which IWS based its claim that Hileman's breach of contract damaged its reputation and all of the people whose views of IWS's reputation changed because of the breach (Doc. 72-10). IWS objected but was later ordered to answer the interrogatories and to produce documents responsive to the request (Doc. 71-11). IWS admitted in its amended answers to interrogatories that it could not ascertain everyone with knowledge of its damaged reputation, but George Randall believed that IWS's reputation was damaged (Doc. 72-12, at p. 8).

Hileman moved to dismiss IWS's Complaint and moved for sanctions against IWS for failing to comply with an August 2016 discovery order. The state court granted Hileman's motion to dismiss the defamation counts without prejudice, and as a discovery sanction, ruled that IWS could not replead the defamation counts until it complied with the discovery order (71-13, at p. 2). IWS subsequently amended its Complaint to pursue only the breach of contract claim (Doc. 71-18). It again sought compensatory damages, return of the settlement proceeds as liquidated damages, and punitive damages. *Id*.

Hileman successfully moved for partial summary judgment on causation and some of IWS's damage claims (Doc. 71-19). IWS appealed. The appellate court affirmed, concluding that IWS's theory as pled in the Complaint – that it lost profits because of the broadcast – was not supportable based on the evidence in the record:

> Accordingly, even were we to assume, arguendo, that [Hileman] breached the agreement in this case by telling Murphey that [IWS] fired [Hileman], and were we to further assume, arguendo, that [IWS] made less profit after the broadcast, we could not conclude that the assumed breach was "plainly traceable" to the assumed lost profits that [IWS] has tied explicitly, in the complaint, to Murphey's broadcast, because it is undisputed that in the broadcast, Murphey never stated that [IWS] fired [Hileman] and in fact never mentioned [IWS] at all.

(Doc. 82-26).

While the state court lawsuit was pending, Hileman filed the instant case, alleging that IWS and Randall retaliated against her for engaging in protective activity under Title VII and the Missouri Human Rights Act by filing the state court action based on false statements of the law and false statements of fact.

## Legal Standard

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The moving party is entitled to summary judgment where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex,* 477 U.S. at 323. If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

## Discussion

Hileman moves for partial summary judgment on her MHRA retaliation claims, asserting that her protected activity was a contributing factor in Defendants' decision to file the state court lawsuit. Defendants move for summary judgment on Hileman's Title VII and MHRA claims, asserting that Hileman cannot establish they had any retaliatory motive for filing the state court lawsuit.

### Count I – Retaliation Under Title VII

Title VII's anti-retaliation provision forbids an employer from discriminating against an employee because the employee opposed any practice made unlawful by Title VII or made a

charge, testified, assisted, or participated in a Title VII proceeding or investigation. 42 U.S.C. § 2000e-3(a). Former employees are protected under the anti-retaliation provision (*See*, *Robinson v. Shell Oil Co.*, 519 U.S. 337 (1997)), and the scope of the provision extends beyond workplace-related or employment-related retaliatory acts and harm. *Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 57, (2006).

To survive summary judgment on her retaliation claim, Hileman must establish that (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there is a causal link between the protected activity and the adverse action. *Hutt v. AbbVie Prods. LLC*, 757 F.3d 687, 693 (7th Cir. 2014) (citation omitted). A materially adverse action "need not be one that affects the terms and conditions of employment but must be 'one that a reasonable employee would find to be materially adverse such that the employee would be dissuaded from engaging in the protected activity.' " *Poullard v. McDonald*, 829 F.3d 844, 856 (7th Cir. 2016), quoting *Roney v. Illinois Dep't of Transportation*, 474 F.3d 455, 461 (7th Cir. 2007). Baseless claims or lawsuits designed to deter claimants from seeking legal redress constitute impermissibly adverse retaliatory actions, even though they do not arise strictly in an employment context. *See Bill Johnson's Restaurants v. NLRB,* 461 U.S. 731, 740 (1983); *Darveau v. Detecon, Inc.,* 515 F.3d 334, 343 (4th Cir. 2008) (finding allegation that plaintiff's employer filed a lawsuit against him alleging fraud with a retaliatory motive and without a reasonable basis in fact or law an actionable adverse employment action under FLSA).

There is no dispute that Hileman engaged in protected activity by filing her initial federal lawsuit and that the state court action could constitute an adverse employment action. The question is whether there is a causal link between Hileman's protected activity and the adverse action. A plaintiff establishes such a causal connection by showing that the defendant "would not have taken

the adverse ... action but for [her] protected activity." *Baines v. Walgreen Co.,* 863 F.3d 656, 661–62 (7th Cir. 2017) quoting *Greengrass v. International Monetary Systems Ltd.*, 776 F.3d 481, 486 (7th Cir. 2015). Direct evidence, such as an admission by the employer of unlawful animus is rare. But a plaintiff may "also supply the causal link through circumstantial evidence from which a jury may infer intentional discrimination." *Id.*, citing *Stephens v. Erickson*, 569 F.3d 779, 787 (7th Cir. 2009). In other words, "[i]f [a] plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate." *Id.* quoting *Morgan v. SVT, LLC*, 724 F.3d 990, 996 (7th Cir. 2013).

Defendants argue that Hileman cannot establish they would not have filed the state court lawsuit but for Hileman initiating the underlying employment discrimination action. First, they point to the 11-month gap between the settlement of the employment discrimination case and the filing of the state court lawsuit as evidence they had no retaliatory intent in filing the state court lawsuit. However, the passage of time alone is not conclusive proof against retaliation; Hileman can rely on other circumstantial evidence to support her claim. *See Malin v. Hospira*, Inc., 762 F.3d 552, 559, 560 (7th Cir. 2014).

Next, Defendants maintain they filed the state court lawsuit because they had a good-faith belief that the settlement contract was breached and that IWS was disparaged by the broadcast and suffered lost profits as a result of Hileman's appearance. In response, Hileman argues that there is sufficient circumstantial evidence to support her claim that the state court lawsuit was baseless and therefore retaliatory. Specifically, she points to Randall's testimony that he overpaid in the employment discrimination case, the fact that although Defendants claim they had been disparaged by the broadcast, they did not sue Fox2 or Murphey for defamation, the fact that she never stated

she was fired in the broadcast – Murphey did – and the fact that IWS was never mentioned by name.  Additionally, Hileman notes that Defendants offered no evidence in the state court action to support their claim that her alleged breach of the settlement contract caused them damages, that they abandoned their defamation claims instead of producing requested discovery, that they attempted to recoup the settlement proceeds and punitive damages in state court although those remedies were not available under Illinois law, and that the Illinois Appellate Court found that Defendants sued Hileman based on conjecture and speculation.

The existence or nonexistence of retaliatory intent is a question of fact, and when viewed in the light most favorable to Hileman, there is sufficient circumstantial evidence to support a finding that Defendants' state court lawsuit against her was filed with retaliatory intent. Accordingly, Defendants' motion for summary judgment is denied as to Hileman's Title VII retaliation claim.

### Counts II and III – Retaliation Under the MHRA

The MHRA makes it unlawful to retaliate or discriminate in any manner against any other person because such person has opposed any practice prohibited by the MHRA.  § 213.070, RSMo.  The Act's reach is not limited to the employer-employee relationship. *Keeney v. Hereford Concrete Prod., Inc.*, 911 S.W.2d 622, 625 (Mo. 1995). To establish a *prima facie* case of retaliation under the MHRA, a plaintiff must prove three requirements: (1) the plaintiff complained of an MHRA-prohibited activity, (2) the employer took an adverse employment action, and (3) a causal connection exists between the complaint and adverse action." *Shirrell v. St. Francis Med. Ctr.*, 793 F.3d 881 (8th Cir. 2015).  The plaintiff "need not show that retaliation was a substantial or determining factor in the employment decision; rather, proving a causal connection between the complaint and the adverse action depends on showing that the complaint was a contributing factor

in the adverse action." *Cosby v. Steak N Shake Operations, Inc.*, 2014 WL 7021766 (E.D. Mo. 2014) (internal quotation omitted).

Again, there are genuine issues of material fact regarding the causal connection element. Hileman maintains that her employment discrimination lawsuit was a contributing factor in Randall's decision to file the state court lawsuit. Defendants assert that Randall was not motivated by anything but the good faith belief that Hileman breached the Settlement Agreement. This is an issue more appropriately decided by the factfinder. Accordingly, the Court will deny the parties' cross-motions for summary judgment as to Hileman's MHRA retaliation claims.

**Attorneys' Fees**

Defendants also move for summary judgment on the issue of Hileman's request for attorneys' fees related to defending the state court lawsuit. Defendants argue that Hileman's claim for attorneys' fees incurred defending the state court action are barred in this case under the doctrine of claim preclusion.

Issue preclusion, also referred to as collateral estoppel, prevents "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment." *Taylor v. Sturgell,* 553 U.S. 880, 892 (2008) (citation omitted). It is properly invoked "when the issue decided in the prior adjudication is identical with the one presented in the current action, there was a final judgment on the merits in the prior adjudication, and the party against whom estoppel is asserted was a party to ... the prior adjudication." *Du Page Forklift Serv., Inc. v. Material Handling Servs.,* Inc., 744 N.E.2d 845, 849 (2001); *see also Adams v. City of Indianapolis,* 742 F.3d 720, 736 (7th Cir. 2014). The party asserting issue preclusion bears the burden of establishing its requisite elements. *Allahar v. Zahora,* 59 F.3d 693, 696 (7th Cir.1995) (citation omitted). Collateral estoppel and issue preclusion are affirmative defenses that must be

pleaded.  Fed.R.Civ.P 8; *DeCoster v. Waushara Cty. Highway Dep't*, 908 F.3d 1093, 1094 (7th Cir. 2018); *see also Rekhi v. Wildwood,* 61 F.3d 1313, 1317 (7th Cir. 1995) (noting that failure to plead collateral estoppel constitutes waiver of defense).

Defendants failed to plead collateral estoppel and issue preclusion in their Answer (*see* Doc. 21).  They subsequently sought leave to amend their Answer to add the defenses, but not until after the close of discovery and the filing of dispositive motions.  Magistrate Judge Beatty denied the request, finding that Defendants were dilatory and failed to establish good cause for allowing the requested relief (*see* Doc. 102).  Thus, Defendants have waived the defenses of issue preclusion and collateral estoppel, and summary judgment is denied as to this point.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment and Plaintiff's Partial Motion for Summary Judgment are **DENIED**.

**IT IS SO ORDERED.**

**DATED:  May 31, 2019**

**STACI M. YANDLE**
**United States District Judge**